UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 3:18cr00025

BENJAMIN DALEY

**DEFENDANT'S SENTENCING MEMORANDUM**

As this Court knows, Mr. Daley pled guilty to a statute that has not been used in decades, while reserving his right to appeal the constitutionality of that statute.  Mr. Daley has previously argued why the Federal Anti-Riot Act is vague and overbroad, and while those arguments will not be repeated at sentencing, they provide a lens for how difficult it is to uncover the core conduct of this offense.  The statement of facts, that the parties agreed to, sets out that Mr. Daley conspired with his co-defendants, to travel to Charlottesville, with the intent to participate in a riot, and that he did in fact participate in two riots.  Here, a "riot" means a public disturbance involving an act of violence, or threat of violence – no matter who started such a disturbance.  In this case there are two: the first, at the Thomas Jefferson statue at the University of Virginia on the evening of August 11, 2017, and the second on 2nd Street NE in Charlottesville, two hours before the Unite the Right Rally began on August 12, 2017.

With regard to the first, there is no evidence that Mr. Daley or any of his co-defendants provoked the violence at the statue, and no victim has been identified that Mr. Daley hit or injured amidst that event.  As for the second, the evidence is

1

clear that Mr. Daley was just one member of a large group of individuals trying to make their way to Emancipation Park to participate in the lawfully permitted rally. With law enforcement feet away, and doing nothing to intervene, violence and chaos again broke out when a group of protesters blocked any path to the rally location. Mr. Daley is guilty of the Anti-Riot act because he traveled with the intent to participate in these sort of disturbances, knowing from his recent experiences at political rallies in California, that they would likely arise.

As applied to this case, the Anti-Riot act is most comparable to the local crime of assault, which has a median sentence in Virginia of two and a half years. A person with a minor criminal history, like Mr. Daley, would fall below the median. Similarly, the bottom end of his appropriate federal guideline range is 27 months, the sentence Mr. Daley seeks from this Court.

Yet the Government now seeks to muddy the waters by focusing not on the conduct relevant to the Anti-Riot act, but Mr. Daley's white nationalist views. By asserting that the hate crime enhancement should apply to Mr. Daley's conduct, the Government must prove that Mr. Daley "intentionally selected" victims for the "but for" reason that they were actual or perceive members of a protected class. This is an untenable position. The detailed recitation of events below focuses on August 12th as the only day for which the Government has any video or testimonial evidence of any actual violence Mr. Daley participated in, and for which there are any identified victims. This factual presentation is necessary to show that the "but for" reason Mr. Daley hit any individual that day was because they were blocking

his path to the park, and not because of actual or perceived membership in a

protected class.   A sentence of more than 27 months will improperly punish Mr.

Daley for his admittedly extreme political views, which are protected by the First

Amendment, instead of his actual conduct.

## I.    <u>Nature and Circumstances of the Offense</u>

> Every law enforcement expert we have consulted (and many who have opined from a distance) shares the view that law enforcement must endeavor to keep groups of protesters and counter-protesters separated from each other at large protest gatherings. To protect the safety of all attendees at these events, even willing combatants in violence, law enforcement must at all times endeavor to create and enforce separation between various groups with divergent perspectives.

> C[harlottesville] P[olice] D[epartment] and V[irginia] S[tate] P[olice] planners failed to follow this important rule of separation on August 12. While they spent many hours considering how to divide Emancipation Park into different areas and keep the Alt-Right protesters separate from confrontational groups, they did not sufficiently plan to protect public safety as attendees moved toward and away from Emancipation Park. The Operational Plan was fundamentally flawed in its lack of focus on areas adjacent to the park—the areas where violence predictably occurred on August 12.[1]

This paragraph comes from the Independent Review of the 2017 Protest Events in

Charlottesville, Virginia.  Specifically, from the Report's analysis of "What Went

Wrong."  Also detailed as things that went wrong included the City of

Charlottesville's last minute attempt to move the rally to McIntire Park, the flawed

police operational plan, the failure of law enforcement to intervene or occupy spaces

where conflict was likely to occur, a lack of unified decision making between the

---

[1] Timothy Heaphy, Final Report: Independent Review of the 2017 Protest Events in Charlottesville, Virginia at p. 158-59 (hereinafter "Heaphy Report"), available online at https://www.huntonak.com/images/content/3/4/v4/34613/final-report-ada-compliant-ready.pdf.

Charlottesville Police Department and Virginia State Police, and many other
factors.

After the police changed operational plans several times in advance of the
rally, the final design created a barricaded zone for attendees of the rally and a
separate barricaded zone for counter-protesters and anyone from the public, each
with one entrance/exit point.[2]  There were also clearly marked areas for police units
to occupy.  The night before the rally, the police made the decision to flip-flop the
zones where rally participants and counter-protesters would be located, creating
even more confusion.  And it was only the evening before the rally that it was
confirmed the event would take place in Emancipation Park at all, instead of
McIntire Park where the City of Charlottesville had attempted to move it.

The rally was set to begin at noon, but many people came earlier, including
Mr. Daley.  Around 10:00 A.M., he was trying to find the right entrance to the park
with Mr. Miselis, Mr. White, and Mr. Gillen, 
when he ran into a group of men organized by
Elliott Kline, aka Eli Mosely.  Mosely was one of
the rally's organizers and he had gathered a
group of men to assist him with the unloading
and moving of equipment for the speakers to use
at noon.  Because of the road closures, and many
changes in plan, this was no easy task.  Mosely

_____

[2] *Id.* at pp. 94-96

4

had marched his group of men from the park winding around the road closures to try to get to the truck with the equipment, while being followed by photographers and videographers. The blue line on the map inset to the right shows the path they had to take around the park. The yellow dot shows where Mr. Daley and his friends ran into them by happenstance and joined the Mosely group.

One of the videographers following the Mosely group was from National Geographic, and the uncut footage from this time period was produced in discovery. The video starting from the point where Mr. Daley joined the Mosely group will be provided to the court as Exhibit A to this sentencing memorandum. The spot where he joined the group was right by the First United Methodist Church in Charlottesville. This is significant, because the First United Methodist Church was being used that day for counter-protester support.[3] The church had "installed metal detectors and required white males to have a 'sponsor' to enter the building that day."[4] At some point in the day, the church had to ask members of Antifa to leave "when they refused to agree to avoid violence."[5]

When Mosely's group, now including Mr. Daley and his co-defendants, turned down 2nd Street NE heading south towards the park, there were initially only a few counter-protesters standing in the street. But a large group of counter-protesters in the parking lot behind the United Methodist Church noticed the group and began to yell at them.

---

[3] Heaphy Report at p. 113.
[4] *Id.*
[5] *Id.*

5

Mosely reached the corner of 2nd Street NE and High Street, where there was a police blockade.  He spoke to the officers there about how to access the equipment and get it into the park.  An officer eventually allowed him to send only three individuals over the barricade to deal with the equipment, and another individual to drive the van out of the area, but would not allow the rest of the group to go past the barricade into the park, which was right across the street.  Mosely confirmed with the officer that he would send these folks across and then the rest of them would march back out the way they came.  Mosely then addressed the group to find volunteers for these roles.

In the approximately eight minutes while this coordination is taking place, a large group of counter-protesters began gathering on 2nd Street NE behind Mosely's group.  They repeatedly chanted "No Trump, No KKK, No Fascist USA" and then Mosely's group began to respond with a chant of "Anti-White" that eventually changed to "You Will Not Replace Us." Since they could not go past the barricade, the only exit was back up 2nd Street NE.

In the front of the group of counter-protesters standing in the middle of the street was a group from the Revolutionary Communist Party, wearing matching black t-shirts with red and orange letters that proclaimed "Revolution-Nothing Less."  This reference is to a film made by the leader of the Revolutionary Communist Party and advocates for revolution to overthrow the system of capitalism and replace it with a socialist republic.  Behind them were other counter-

6

protesters and observers.  Between the two groups were numerous people with

cameras.





When a helicopter flew past, one individual in the front of Mosely's group yelled "Oh

no it's Pinochet in a helicopter, run communists."

    A minister that came to peacefully protest that day from Richmond and shot

one of the videos depicting what happened on 2nd Street NE later testified to the

Grand Jury in this case that the "white nationalists ended up in what amounted to a dead end on 2nd Street, and so they walked themselves into a place they couldn't continue out of, so thay had to turn around and come back." He had a sense "something might happen at this point" because "they were coming into conflict with, again, I'm not sure the best way to characterize, whether it's Antifa or not, but there was a group of thugs with black shirts on that were coming to sort of confront them on that street, and so they were getting, they were resultingly being blocked in." This same was asked whether there was "some verbal jousting back and forth between the groups," and responded "[y]es, certainly most of it was coming from the folks in the black T-shirts, the counter-protesters."

Mosely then commanded everyone's attention, telling his group that they have to march back through the counter-protesters to be able to get to the park. He directed them to move through the line in a two-file line and to do it safely while ignoring the counter-protesters. Mr. Daley can be seen near the front of the group gesturing that the line move against the stone wall instead of going up the middle of the street. During this entire time, there were numerous law enforcement officers at the corner of 2nd Street NE, just feet away, who did nothing. Notably, obstruction of free passage was a criminal offense that was specifically addressed with law enforcement in advance of August 12th.[6]

The first individuals in the group put their hands on the shoulders of the people in front of them, and got in a line on the sidewalk on the stone-wall side of the street.

_____

[6] Heaphy Report at p. 97.

As they started walking, the counter-protesters crowded to the edge of the sidewalk and continued yelling. The Mosely group got blocked up around a No Parking Sign where an altercation broke out between two members of the Revolutionist Communist Party and one member of Mosely's group (not Mr. Daley or any other member of RAM). At 10:12:33 of Exhibit A, the two members of the Revolutionist Communist Party threw punches at this member of Mosely's group after this member shoved the megaphone of the counter-protester out of the way while he was walking past.



The woman with the tattoo on her arm fell to the sidewalk after the punch (or was

pushed, it is admittedly hard to tell), and this broke the flow of the Mosely group

walking on the sidewalk.  Mr. Daley, in line right behind this incident, was now

separated from the group ahead of him on the sidewalk.  Other counter-protesters

got on the sidewalk and physically stood in between Mr. Daley (white long-sleeved

t-shirt, blond hair and

sunglasses) and the path

forward.  In particular,

the man with the blue

and white baseball cap

held onto the No Parking

sign with his right hand,

and braced himself,

holding onto the stone



wall with his left hand, completely blocking the sidewalk.  At this point, Mr. Daley

shoved one person out of the way, and punched another. His co-defendants, Mr.

Miselis and Mr. White, can also be seen physically pushing people and throwing

punches over the next 30 seconds until the Mosely group finally got through the

counter-protesters and into the parking lot of the United Methodist Church.  Not

pictured in this video, but pictured in a different video that the Government will

introduce as evidence, is one counter-protester who had "a stick" and who was

"striking at the white nationalists," according to the minister from Richmond who

took that video.  The rector of St. Paul's Church in Charlottesville was standing in the parking lot behind the United Methodist Church when the fight broke out and described that he "saw law enforcement officers standing on either end of 2nd Street NE, bookending the crowds" but that "[w]hen the fight broke out, none of the officers made a move."[7]

In the course of this 30 seconds, Mr. Daley threw punches.  He punched a protester at least twice, kicking him once he did attempt to punch a second protester. He grabbed a protester wearing a Revolutionist Communist Party t-shirt and threw her off the sidewalk.  Notably, this protester was the same woman who first punched the member of Mosely's group starting the violence.  Mr. Daley grabbed another female protester, at the throat, and threw her off the sidewalk.  Mr. Daley's actions were not in self-defense, but they were in direct response to the counter-protesters deliberately trying to prevent access to the only way out of 2nd Street NE.

*Background About the Rise Above Movement*

When Mr. Daley came to Charlottesville in August of 2017, it was not the first time he had taken part in a political protest.  He was from California, and he had attended prior pro-Trump and political rallies in California.  The Rise Above Movement came together in early 2017 as a group focused on physical fitness, and avoiding illegal substances.  The members also shared a common political worldview.

---

[7] *Id.* at p. 139.

The timing is important because early 2017 was after two violent clashes in California in 2016 that a U.S. Department of Homeland Security Field Analysis Report described as "between anarchist extremists and lawfully protesting white supremacists at legally permitted rallies."[8]  Discussing 2016 confrontations in Sacramento and Anaheim, the report noted that "[s]ome anarchist extremists and lawfully protesting white supremacists came to the events with weapons, suggesting that they were prepared to engage in violence.  Most of the attackers, however, used makeshift weapons."[9] In particular:

> On 27 February 2016, violence erupted at a legally permitted white supremacist rally in Anaheim after anarchist extremist elements of a violent anti-fascist group attacked white supremacists moments after the white supremacists arrived at the publically announced rally locations.  According to [redacted], violent anti-fascists punched and kicked the white supremacists; hurled rocks, bottles and other projectiles; and assaulted them with makeshift weapons including wooden sticks, clubs, and a skateboard.[10]

The white supremacists in attendance responded in kind.[11]  The report notes that similar "less violent, clashes between anarchist extremists and lawfully protesting white supremacists occurred during rallies in Sacramento in 2012 and Los Angeles in 2010."[12]

The report noted that "[m]any of the violent anti-fascists and anarchist extremists at the 2016 events in Sacramento and Anaheim wore 'black bloc' attire—

---

[8] Field Analysis Report, US. Department of Homeland Security, September 2016, attached hereto as Exhibit B (redactions in original)
[9] *Id.*
[10] *Id.* at 2.
[11] *Id.*
[12] *Id.*

dressing completely in black or dark colors and wearing masks and bandanas—to hide their identities from law enforcement or journalists while they committed violent acts against the white supremacists."[13]  This report concluded by stating "Anarchist extremists with anti-fascist motivations have a long history of violence, including reciprocal violence, against lawfully protesting white supremacists at planned events nationwide" and warned law enforcement to be aware of the occurrence of such events.[14]  Of course, the report also noted that "white supremacist extremists have previously plotted against and attacked violent anti-fascists and anarchist extremists" as well.[15]

The Rise Above Movement formed in the aftermath of these 2016 events. Members did attend numerous political rallies in California in 2017, including the Make America Great Again rally in Huntington Beach, and the rally in Berkeley that are both described in the indictment.  In the words of ProPublica, the news organization that first drew attention to the Rise Above Movement, the Huntington Beach march "also drew a small contingent of anti-Trump protesters, including some militant [A]ntifa activists, and some people intent on physically blocking the procession as it moved along the Pacific Coast Highway."[16]  The article continues,

---

[13] *Id.* at 5.
[14] *Id.* at 7.
[15] *Id.*
[16] A.C. Thompson, Ali Winston & Darwin BondGraham, *Racist, Violent, Unpunished: A White Hate Group's Campaign of Menace*, PROPUBLICA, Oct. 19, 2017, https://www.propublica.org/article/white-hate-group-campaign-of-menace-rise-above-movement.

"[b]efore long, the scene turned violent and brawls between the political foes swept across the beach."

At the Berkeley pro-Trump rally a few months later, there was more violence. And members of the Rise Above Movement did fight back. But they were not the only ones. For example, a former East Bay college philosophy professor, Eric Clanton, attended the rally that day with Antifa protesters and attacked someone with a bike lock, striking him in the head.[17] He pleaded guilty to this offense and received three years of probation. Like Mr. Daley, Eric Clanton attended the Berkeley rally with his face covered with a cloth. Members of the Rise Above Movement also attended other political events in 2017 that never made the news because there was no violence, such as the "March 4 Trump" rally on March 4, 2017 in San Diego, CA, an event at Cal Ply San Luis Obispo, and a May Day march in Los Angeles.

In the lead-up to August 12, 2017, the Department of Homeland Security Office of Intelligence and Analysis issued a Homeland Intelligence Today bulletin with the headline: "Domestic Terrorist Violence at Lawfully Permitted White Supremacist Rallies Likely to Continue."[18] The bulletin warned that "[a]narchist extremists and white supremacist extremists are calling on supporters to be

---

[17] Emilie Raguso, *Eric Clanton takes 3-year probation deal in Berkely rally bike lock assault case*, BERKELEYSIDE, Aug. 8, 2018, https://www.berkeleyside.com/2018/08/08/eric-clanton-takes-3-year-probation-deal-in-berkeley-rally-bike-lock-assault-case
[18] U.S. Department of Homeland Security Office of Intelligence and Analysis, Homeland Intelligence Today, August 9, 2017, attached hereto as Exhibit C.

14

prepared for or to instigate violence at the 12 August rally," and detailed six prior rallies between February of 2016 and August of 2017 to conclude that "anarchist extremists' use of violence as a means to oppose racism and white supremacist extremists' preparations to counterattack anarchist extremists are the principal drivers of violence at recent white supremacist rallies."

Mr. Daley did travel to Charlottesville with the expectation that he or other RAM members might engage in violent confrontations with counter-protesters in Charlottesville because that was the typical pattern of conflict. That does not justify Mr. Daley's actions, but it does support the argument below that his physical fighting that day should not be enhanced under the hate crime guideline, because the victims were political foes and not selected on the basis of race, religion, or membership in any other protected class.

II.     **The appropriate guideline range is 27-33 months.**

The first thing the Court will do at sentencing is review the presentence report, consider any outstanding objections and determine the correct guideline range. Because objections to the presentence report were only recently due, the probation office has not yet responded with a final presentence report. For purposes of this memorandum, only legal objections will be addressed, and any remaining factual objections will be handled at sentencing. The correct guideline range is 27-33 months, based on a criminal history category of I and an offense level of 18.

## A. Mr. Daley's Criminal History is Incorrect

The presentence report has assigned Mr. Daley two criminal history points for being "under a criminal justice sentence" at the time the defendant committed the instant offense. Mr. Daley was sentenced to 36 months of probation on June 16, 2014. His term of probation, and therefore his sentence, was completed in June of 2017 – two months before he came to Charlottesville to participate in the Unite the Right rally. Jason Kessler, the primary organizer for the Unite the Right rally, began reaching out to speakers for the event and working on flyers in July of 2017.[19] Mr. Daley only made plans to attend the Unite the Right rally in late July of 2017. The conspiracy to travel with the intent to riot simply could not begin before any member of the conspiracy knew about the rally or intended to come to Charlottesville.

The courts to consider this issue have uniformly agreed that a defendant must have intended to commit the offense of conviction during the earlier conduct which is sought to be included as relevant conduct under U.S.S.G. § 1B1.13. For example, the Sixth Circuit in *United States v. Shafer*, 557 F.3d 440 (6th Cir. 2009) (opinion later withdrawn and substituted on different grounds not discussing relevant conduct analysis) explained that there is little caselaw analyzing the phrase "in preparation for" but agreed with the Fifth Circuit that the defendant must have intended to commit the offense for which he was sentenced when committing the relevant conduct for it to count as "in preparation for" the offense.

---

[19] Heaphy Report at p. 78.

In support of this view, the Sixth Circuit relied on the common and natural usage of the phrase "in preparation of" which encompasses "[t]hings done to get ready for an event or undertaking; preparatory measures." *Id.* at 447 citing Oxford English Dictionary Online (defining "preparations"). The Sixth Circuit noted that a "lack of an intent requirement would expand the realm of 'relevant conduct' to include any and all conduct that preceded the offense of conviction, even if that conduct was not done with any intent or purpose to prepare for the offense of conviction." *Id.* Further, "[t]here is no support for such a broad reading of 'in preparation for' in the text of the guidelines or in the caselaw." *Id.* The Fifth Circuit has likewise found that a defendant must intend to commit the underlying offense at the time of the prior conduct for it to count as relevant conduct. *United States v. Yerena-Magana*, 478 F.3d 586 (5th Cir. 2007) (defendant's illegal border crossing was not relevant conduct for subsequent drug offense because there was no evidence the defendant intended to commit the drug offense he was specifically sentenced for when he crossed the border). *See also, e.g., United States v. Ewing*, 632 F.3d 412 (8th Cir. 2011) ("the fact that Ewing opportunistically stole a vehicle during the course of one robbery that he used in a separate robbery two days later does not make the first robbery relevant conduct to the second…"); *United States v. Howard*, 759 F.3d 886 (8th Cir. 2014) ("conduct considered 'in preparation for' an offense means actions that were 'taken prior to, and in order to facilitate, the charged offense").

A contrary ruling would stretch the relevant conduct rule set forth in U.S.S.G. § 1B1.3 beyond recognition. The Court should find that the offense began

when Mr. Daley first prepared to come to Charlottesville, which was in July of 2017 – after his term of probation was complete. Therefore, Mr. Daley should be a criminal history category I.

## B. The Hate Crime Enhancement Does Not Apply

The presentence report has applied the hate crime enhancement from U.S.S.G. § 3A1.1. However, this enhancement can only apply if the Government proves at sentencing, beyond a reasonable doubt, that

> The defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person.

This intent was not alleged in the indictment, and it was not agreed to in the statement of facts, and the Government cannot prove it beyond a reasonable doubt at sentencing.

As an initial matter, the probation office will not identify any specific victims for whom the hate crime enhancement applies and has instead explained that it applies because photographs show that "minorities as well as clergy" were victims of the offense. In contrast, the Government has suggested that the hate crime enhancement applies because Mr. Daley's actions were motivated by his general animus towards Jews. Therefore, because he generally perceived his enemies to be "Jews"—so the Government's reasoning goes—anyone he hit on August 11 or 12th must have been perceived by Mr. Daley as a Jew, and therefore the hate crime enhancement applies. An alternate theory is that Mr. Daley perceived the counter-protesters as supporting minority ethnic and racial groups. And finally that Mr.

Daley was also biased against women.  Adding to the intrigue, the FBI has not even bothered to contact several of the individuals that are alleged to be victims of the offense.  As for August 11th, the FBI does not even know who Mr. Daley supposedly assaulted, or the circumstances of the assault, just that Mr. Daley said he hit some people that night during the chaos "as disorders broke out in front of the Rotunda and torches flew in the air..."[20]

The general confusion over the theory for why the enhancement could possibly apply in this case reveals the problem with applying the enhancement in this case.  Mr. Daley has white nationalist views, and he has made negative comments about Jewish people, communists,[21] women, Antifa, minorities, and almost everyone, in the past.  He came to the Unite the Right rally in Charlottesville holding those views, but holding and expressing those views is not a crime.  The hate crime enhancement cannot be applied on the theory that Mr. Daley intentionally selected his victims because he generally disliked Jewish people, racial minorities, ethnic minorities, clergy, and women without violating the clear text of the guideline as well as the First Amendment.

––––––––––––––––––––

[20] Heaphy Report at 118.  Notably, the Heaphy Report also describes that "[o]n at least one occasion, a counter-protester attempted to knock down a torch, resulting in a physical altercation." *Id.*  The University of Virginia Police Department was on site and in total made one arrest after the incident.  Several individuals were treated for exposure to pepper spray, and there were no "serious injuries" although the event obviously had a significant emotional impact  *Id.* at 119-20.
[21] For example, Special Agent Meyer with the Federal Bureau of Investigation reviewed all of the social media information received in this case from Twitter and Facebook for members of RAM as well as the accounts for the organization and testified to the Grand Jury that "members of RAM frequently refer to their political opponents or foes as 'Commies.'"

1. *Fundamentally the Government is seeking to apply the enhancement based on Mr. Daley's political views which are not a basis for the enhancement*

The Government assured this Court in response to Mr. Daley's motion to dismiss that this case was about "four individuals that turned their *political* views into violent action, and in doing so, they violated federal law."[22]  Indeed the Government asserted that the "Defendants travelled to Charlottesville looking to fight and to hurt those who disagreed with their *political* views" and that they "celebrated the violent blows they inflicted on their *political* enemies."[23]  Indeed, "Defendants promoted themselves and their organization as a white nationalist outfit that lived clean and healthy lives so they would be fit to 'smash[] commies' and others who disagreed with their *political* views."[24]  The Government described the indictment as alleging that "Defendants' openly expressed anti-Semitic, racist, and white supremacist views, and alleges that Defendants promoted violence against those that they believe held opposing *political* views."[25]  They "promoted violence against those they believed to hold opposite *political* views." [26]  They "travelled with the intent to engage in violence with their *political* foes and then engaged in such unlawful conduct"[27] and "engaged in a pattern of engaging in physical violence against their perceived *political* foes."[28]  The United States

---

[22] Government Response to Motion to Dismiss, ECF #79 at 1 (emphasis added).
[23] *Id.* at 2 (emphasis added).
[24] *Id.* at 3 (emphasis added).
[25] *Id.* at 9 (emphasis added).
[26] *Id.* (emphasis added).
[27] *Id.* at 10 (emphasis added).
[28] *Id.* at 27 (emphasis added).

Attorney elaborated at a press conference after the guilty pleas in this case: "Although the First Amendment protects an organization's right to express abhorrent political views, it does not authorize senseless violence in furtherance of a *political* agenda."[29]  Of course the hate crime enhancement does not make "political affiliation" a protected class.  The Government's attempts to change course and claim instead that Mr. Daley intentionally selected victims based on his perception they were Jewish is simply not supported by the facts.

>   2. *Improper motivation must be the "but for" reason the defendant intentionally selected a victim.*

The Government must prove, beyond a reasonable doubt, that the "the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation" was the "but for" reason Mr. Daley "selected" the victim.  It cannot do so in this case.

In *Burrage v. United States*, 134 S. Ct. 881, 887-89 (2014), the Supreme Court decided that the enhancement for when death or serious bodily injury "results from" a drug distribution required the drug distribution to be the "but for" cause of the death or serious bodily injury.  To reach this conclusion, the Court looked to a prior decision analyzing the language "because of."  Specifically, the statute that prohibits adverse employment action "because of" an employee's age or complaints

---

[29] Press Release, Department of Justice, Remaining Members of California-Based White Supremacist Group Plead Guilty to Federal Rioting Charges in Connection with August 2017 "Unite the Right" Rally in Charlottesville (May 3, 2019) https://www.justice.gov/usao-wdva/pr/remaining-members-california-based-white-supremacist-group-plead-guilty-federal-rioting (emphasis added).

about unlawful workplace discrimination. *Burrage*, 134 S. Ct. at 887-89 (citing *Nassar*, 133 S. Ct. 2517 (2013)). In *Nassar*, the Court affirmed that "because of" meant "but-for-cause." *Burrage* extended this reasoning to include the language "results from." And specifically noted that "Congress could have written §841(b)(1)(C) to impose a mandatory minimum when the underlying crime 'contributes to' death or serious bodily injury" but "chose instead to use language that imports but-for causality." *Id.* at 891.

The Sixth Circuit applied this reasoning to conclude that the hate crime statute 18 U.S.C. § 249(a) required "but for" causation. The hate crime enhancement language mirrors the language from 18 U.S.C. § 249(a) in a key respect. Both require the defendant's actions to be "because of the actual or perceived race, color, religion, [or] national origin" of any person, and the guideline enhancement includes the additional categories of ethnicity, gender, gender identity, disability, and sexual orientation. Analyzing the "because of" language from § 249(a), the Sixth Circuit found "'[B]ecause of' in brief means what it says: The prohibited act or motive must *be* an actual *cause of* the specified outcome." *Miller*, 767 F.3d at 592. Furthermore, this conclusion "makes good sense in the context of a criminal case implicating the motives of the defendants." *Id.* The alternative, that an improper motive be simply a "significant motivating factor" would not "sufficiently define the prohibited conduct." *Id.*

The Sixth Circuit also recognized the significant concern that "[a]ny standard that requires less than but-for-causality [] treads uncomfortably close to the line

22

separating constitutional regulation of conduct and unconstitutional regulation of beliefs." *Id.* "[P]unishment of a defendant's "abstract beliefs," no matter how "morally reprehensible" they may be, violates the First Amendment. *Id.* (citing *Dawson v. Delaware*, 503 U.S. 159, 167 (1992)). By "[r]equiring a causal connection between a defendant's biased attitudes and his impermissible actions" we can be assured that "the criminal law targets conduct, not bigoted beliefs that have little connection to the crime." *Id.*

This same analysis applies with equal force to the hate crime guideline enhancement the Government seeks to apply in this case.

### 3. The "but for" reason Mr. Daley fought the counter-protesters on August 12th is that they were blocking the only path

The Government has admitted in the statement of facts that the counter-protesters Mr. Daley hit on August were "blocking their path to the park." The video submitted as Exhibit A to this sentencing memorandum, also described above, makes it clear that Mr. Daley hit the counter-protesters on August 12th because they were physically blocking the path of the Mosely group trying to exit Second Street to get to the park.

### 4. There is no evidence Mr. Daley "intentionally selected" anyone on the basis of a protected class

The Government has not identified specific victims for whom the hate crime enhancement applies, instead alleging that the enhancement applies to everyone Mr. Daley and his co-conspirators hit on August 11 or August 12. This includes individuals that were never identified, or seen on camera. The vast majority of

those that are visible on camera, and all of the victims that testified before the grand jury, are white.  Not only is there no specific evidence that the victims themselves are members of a protected class other than that some are women and one is a black male, there is no evidence that Mr. Daley or his co-conspirators made any statements about any protected class during the offense, or in the minutes leading up to the offense.  There is evidence that two groups of people were shouting at each other.  The counter-protesters shouting things like "No Trump, no KKK, no Fascist USA" and the group Mr. Daley was with shouting things back like "anti-white" and "you will not replace us," and calling the other group "commies" and flashing the "okay" hand gesture which has been adopted by some to signify "white power."  Moreover, as set forth above, to the extent Mr. Daley "intentionally selected" anyone during the 30 seconds of chaos on 2nd Street NE, it was because they were blocking the path and not because of their actual or perceived membership in a protected class.

Summing up the event perfectly, the minister from Richmond who testified before the Grand Jury and who took one of the key video depicting these events said that the fighting "sort of seemed haphazard to me."  And the cooperating witness in this case and member of RAM, Cole White, told the FBI in his proffer that "Daley was just throwing random punches at anyone in their way."

### 5. Applying the hate crime enhancement because of Mr. Daley's general white nationalist views would violate the First Amendment

The murky theory that Mr. Daley intentionally selected victims because he generally perceived all of his political enemies to be "Jewish" is not enough to apply

24

the hate crime enhancement without violating the First Amendment.  As the Sixth Circuit warned, "punishment of a defendant's "abstract beliefs," no matter how "morally reprehensible" they may be, violates the First Amendment. *Miller*, 767 F.3d at 592 (citing *Dawson v. Delaware*, 503 U.S. 159, 167 (1992)).  Without strict adherence to the guideline's requirement that a victim be "intentionally selected," and that the selection be "because of" a protected class, the guideline would be overbroad and fail to meet the test for incitement set forth in *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1960).  Reliance on general white nationalist statements Mr. Daley has made in the past would "sweep[] within [the guideline's] condemnation speech which our Constitution has immunized from governmental control."  *Id.*

The Government's theory, as applied to Mr. Daley, creates a serious attenuation problem.  The speech here that shows Mr. Daley was anti-Jew in particular was not contemporaneous with the incident, but occurred months before, and is scattered within his other white nationalist statements and exhortations. And there is nothing to suggest that Mr. Daley perceived the group of counter-protesters gathered on the street were Jewish.  This takes this case far out of line with the only cases that apply this enhancement based on "perceived" membership in a protected class instead of "actual" membership in a protected class.  *See, e.g., In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 154 (2d Cir. 2008) (claim that bombing targeted victims because of U.S. citizenship and not necessarily U.S. origin rejected because "it was not necessary for al Qaeda to

25

distinguish between nationals and citizens, or naturalized and birthright U.S.

citizens, so long as it perceived the victims as having a U.S. national origin.")

> 6. *The Court should decline to apply the guideline because Application Note 1 limits the enhancement to "offenses that are hate crimes"*

Application Notes to § 3A1.1(a) state that "[s]ubsection (a) applies to offenses

that are hate crimes." The Fourth Circuit has held that the "Application Notes in

the Sentencing Guidelines are binding and therefore limit sentencing discretion

unless the Notes are contrary to federal law." *United States v. Hudson*, 272 F.3d 260

(4th Cir. 2001) (citing *United States v. Banks*, 130 F.3d 621, 624-25 (4th Cir. 1997).

Although *Hudson* is before *United States v. Booker*, 543 U.S. 220 (2005), the opinion

that held federal sentencing guidelines to be advisory rather than mandatory, the

Western District of Virginia has reaffirmed that Application Notes are binding.

*United States v. Johnson*, 556 F. Supp. 2d 563, 571 n.4 (W.D.V.A. 2008) (citing

*Hudson*, 272 F.3d 260).

The Federal Anti-Riot Act is not a hate crime.  Therefore, the enhancement

cannot apply.  Mr. Daley recognizes that the enhancement has been applied by

other courts to crimes that are not hate crimes, but nonetheless, argues that this

court should apply the plain meaning of the Application Note.

**III.    An appropriate sentence in this case is 27 months**

This Court should sentence Mr. Daley to 27 months – the bottom-end of the

negotiated range in the plea agreement.  Mr. Daley has only one prior criminal

offense – misdemeanor concealed carry of a weapon in California.  The presentence

report correctly details his history of teenage substance abuse, which he overcame after participating in several treatment programs. He graduated high school, and has always been employed, most recently running his own tree trimming business (*see* photo inset at right). The primary focus of the Rise Above Movement was physical fitness, healthy living, and avoiding controlled substances, which helped to keep Mr. Daley sober. Mr. Daley also has a supportive family – parents who



travelled here from Oregon for his bond hearing and will come again for his sentencing – as well as many others who have written letters of support that are attached hereto as Exhibit D.



A 27-month sentence will send the message that travelling with the intent to riot is a serious crime. It would also be consistent with the core conduct in this case – the fighting that Mr. Daley participated in on 2nd Street NE is comparable to an assault. The data for assaults prosecuted in the Commonwealth of Virginia shows that the median sentence for all the adults convicted

27

between fiscal year 2012 and fiscal year 2017 was 2.5 years.[30]  Considering that Mr.
Daley is of the lowest criminal history score, his sentence should almost certainly
fall beneath the median.  It also reflects the low end of the federal guideline range
for assault.

More importantly, a longer sentence is not required to send a message to Mr.
Daley, or to others, that traveling to get into fights with Antifa is not lawful or a
good idea.  After August 12, 2017, and ProPublica's journalism that made public the
members of the Rise Above Movement, the group stopped attending political rallies.
Mr. Miselis lost his job.  Mr. Daley's tree-trimming business took a hit.  Mr. Daley
and some of his co-defendants travelled to Europe, but did not participate in any
violent altercations with Antifa at any rallies after August 12, 2017 and up to their
arrest for this offense on October 2, 2018.  The message has been received.

Respectfully submitted,

BENJAMIN DALEY

By Counsel

Counsel:

/s Lisa M. Lorish
Lisa M. Lorish
Assistant Federal Public Defender
401 East Market Street, Suite 106
Charlottesville, VA 22902
VSB 81465
Tel. (434) 220-3380

---

[30] 2018 Annual Report, Virginia Criminal Sentencing Commission, available online
at http://www.vcsc.virginia.gov/2018AnnualReport.pdf

28

Fax (434) 220-3390
Lisa_Lorish@fd.org

Frederick T. Heblich, Jr.
First Assistant Federal Public Defender
401 East Market Street, Suite 106Charlottesville, VA 22902
VSB 21898
Tel. (434) 220-3380
Fax (434) 220-3390
Fred_Heblich@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (ECF) to all parties of record

/s Lisa M. Lorish
Lisa M. Lorish
Assistant Federal Public Defender